USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___1/27/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ROBERT BERLINGER, DANNY COLLINS,
and DAVID STOCKTON, on behalf of
themselves and all others similarly
situated,

                Plaintiffs,

        - against -

VIAGOGO ENTERTAINMENT, INC.,

                Defendant.

**25 CV 4380 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

In this class action, plaintiffs Robert Berlinger, Danny Collins, and David Stockton, on behalf of themselves and others similarly situated (collectively, "Berlinger"), allege that defendant viagogo Entertainment Inc. ("Viagogo") violated New York consumer protection laws – and similar laws in California, New Jersey, and Colorado – by using a "bait-and-switch" scheme on its website to entice consumers to purchase live entertainment tickets. ("First Amended Complaint" or "FAC," Dkt. No. 10.) Viagogo now moves to compel individual arbitration pursuant to the Federal Arbitration Act ("FAA") and stay the claims pending resolution of that arbitration. (See Dkt. No. 17.) For the reasons set forth below, Viagogo's motion is **GRANTED**.

## I.    BACKGROUND[1]

Viagogo is an online ticket exchange website – also known as a secondary ticket marketplace - that facilitates ticket sales and marketing for live entertainment events. (See FAC ¶ 18; Declaration of James Wright in support of Viagogo's motion, "Wright Decl.," Dkt. No. 19 ¶ 3.) Viagogo does not own or set prices for the tickets listed on its website but instead allows current ticket holders to determine prices and offer their tickets to buyers. (See Wright Decl. ¶ 4.) For each transaction, Viagogo charges a fee to the seller and buyer. (See id. ¶ 5.) Accordingly, the total price of a ticket is divided into a base price and the additional transaction fees. (See FAC ¶ 21.)

To complete a transaction on Viagogo's platform, a buyer must advance through a purchase flow process. First, users select the event and the number of tickets they intend to purchase. (See FAC ¶ 24; Wright Decl. ¶ 7.) Users are next directed to a seating chart of the venue or location, where they can choose among seating options. (See FAC ¶ 24; Wright Decl. ¶¶ 8-9.) At this stage, Viagogo displays only the base price of the ticket set by the seller – an amount that does

---

[1] The Court draws the following facts from the First Amended Complaint and the supporting declarations and exhibits attached to the parties' briefs.

not include the additional fees Viagogo charges for facilitating the transaction.[2] (See FAC ¶ 24; Wright Decl. ¶ 9.) After users select the tickets, they are presented a pop-up window stating, "You have 10 minutes to complete your purchase" and "The price of your ticket will be locked during this time." (FAC ¶ 24; Wright Decl. ¶ 10.) If users press the "Start" button, they are then prompted to select a payment method and input their billing information. (See FAC ¶ 24; Wright Decl. ¶ 11.) While completing these steps, the ten-minute countdown timer is visible at the top of the screen and appears on the webpage tab. (See FAC ¶ 24.) The price displayed continues to reflect the base ticket price without the additional fees. (See id.) When users select a payment method and enter their billing information, they are presented a checkout screen displaying the total price – the previously displayed base ticket price in addition to the transaction fees – and are directed to input payment information. (See FAC ¶ 24; Wright Decl. ¶ 12.)

If users navigate away from the purchase flow, a pop-up appears with a reminder to "Secure your tickets!" above the

---

[2] In some states – including California, Colorado, Connecticut, Maryland, Minnesota, New York, North Carolina, and Tennessee – Viagogo displays the total price (base price plus transaction fees) during the initial stages of the purchase flow. (See FAC ¶ 35.)

countdown timer. (FAC ¶ 24.) If users fail to complete the purchase within ten minutes, they are redirected to the event page and must complete the steps again. (See id.) If users do enter payment information, they can then click the "Review Order" button that appears above language indicating that the user will not yet be charged. (Id.) Finally, users are presented with a large green "Buy Now" button on the checkout screen with the following statement displayed directly above: "By clicking the button below you acknowledge and accept our terms and conditions and privacy policy." (Wright Decl. ¶ 12.) Both the "terms and conditions" and the "privacy policy" are hyperlinked to the relevant documents. (Id. ¶ 13.)

If users opt to review the "terms and conditions," they are presented with a Global User Agreement (the "Agreement"), which discloses on the first page, in all-capitalized, bold text that the Agreement "CONTAINS AN AGREEMENT TO ARBITRATE" requiring users "TO SUBMIT CLAIMS . . . AGAINST [VIAGOGO] TO BINDING AND FINAL ARBITRATION" unless they choose to opt out. (Wright Decl. ¶¶ 13-14; "Agreement," Dkt. No. 19, Ex. A, § 1.) The first-page language also provides in bold, capitalized text that a user "WILL ONLY BE PERMITTED TO PURSUE CLAIMS AGAINST [VIAGOGO] ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE

ACTION OR PROCEEDING." (Id.) A later subsection of the Agreement details the "Opt-Out Procedure" and hyperlinks to a form that users must complete to opt out of arbitration. (Wright Decl. ¶ 14; Agreement § 23.1.)

The named plaintiffs in this case – collectively "Berlinger," as noted – are three individuals residing in New Jersey, Colorado, and California who used Viagogo's ticket marketplace to purchase tickets to events located in New Jersey, Switzerland, and Washington. (See FAC ¶¶ 39-40, 53-54, 67-68.) They bring this class action on behalf of themselves and others similarly situated. (See id. ¶ 81.)

Berlinger alleges that Viagogo's purchase flow relies on "bait-and-switch" tactics to "lure consumers into purchasing tickets." (Id. ¶ 1.) Berlinger contends that Viagogo "advertises misleading low initial ticket prices that do not include added fees . . . to entice consumers to click through many screens in its purchase flow," and lists the total transaction amount – including fees – only on the final checkout window. (Id.) Berlinger further asserts that Viagogo pressures ticket buyers by displaying the ten-minute countdown timers. (See id. ¶ 4.) Berlinger alleges that, as a result of Viagogo's "false advertising" of low ticket prices, they "purchased tickets they would not have otherwise

5

bought and paid fees they would not have otherwise paid." (Id. ¶ 9.)

All plaintiffs, on behalf of the nationwide class, bring claims for alleged violations of New York Arts and Cultural Affairs Law § 25.07 and New York General Business Law § 349 and § 350. (See FAC ¶¶ 95-140.) Individual plaintiffs, and on behalf of the subclasses, bring claims for alleged violations of California's False Advertising Law (Cal. Bus. & Prof. Code § 17500), California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200), California's Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750 et seq.), New Jersey's Consumer Fraud Act (N.J. Stat. Ann. §§ 56:8-1 et seq.), and Colorado's Consumer Protection Act (C.R.S.A. § 6-1-101 et seq.). (See FAC ¶¶ 141-180.)

Berlinger filed the First Amended Complaint in this action on July 10, 2025. (See FAC.) On August 8 and August 29, the parties exchanged pre-motion letters pursuant to this Court's Individual Practice II.B. (See Dkt. Nos. 12-13.) On November 5, Viagogo filed its motion to compel arbitration (see Dkt. No. 17), supported by a memorandum of law. (See "Mem.," Dkt. No. 18.) On December 5, Berlinger filed an opposition. (See "Opp'n," Dkt. No. 20.) On December 19, Viagogo filed a reply. (See "Reply," Dkt. No. 21.)

## II.  <u>LEGAL STANDARD</u>

The FAA provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA reflects "a liberal federal policy favoring arbitration agreements," <u>AT&T Mobility LLC v. Concepcion</u>, 563 U.S. 333, 346 (2011) (quoting <u>Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24 (1983)), and places arbitration agreements on "the same footing as other contracts." <u>Schnabel v. Trilegiant Corp.</u>, 697 F.3d 110, 118 (2d Cir. 2012) (quoting <u>Scherk v. Alberto-Culver Co.</u>, 417 U.S. 506, 511 (1974)). Any party to such a contract "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court" which would otherwise have jurisdiction over the subject matter of the dispute to enforce the agreement. 9 U.S.C. § 4. So, too, may a party already litigating in district court file a motion to compel arbitration. <u>See</u> 9 U.S.C. § 6.

Before an agreement to arbitrate can be enforced, the district court must first determine whether an agreement exists between the parties. <u>See</u> <u>Schnabel</u>, 697 F.3d at 118.

This question is determined by state contract law. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016). If a district court concludes that an agreement to arbitrate exists, it should next determine "whether the particular dispute in question falls within the scope of that arbitration agreement." Kern v. Stubhub, Inc., No. 24-CV-871, 2024 WL 5283923, at *2 (S.D.N.Y. Dec. 17, 2024) (internal quotation marks and citation omitted).

In deciding motions to compel arbitration under Sections 4 and 6 of the FAA, "the court applies a standard similar to that applicable for a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003); see also Meyer v. Uber Techs., 868 F.3d 66, 74 (2d Cir. 2017). Courts "must consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." Nicosia, 834 F.3d at 229 (cleaned up). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." Id. (quotation marks and citation omitted).

## III. <u>DISCUSSION</u>

A.    <u>CONTRACT FORMATION</u>

"The threshold question facing any court considering a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate," a question which is determined pursuant to state contract law. <u>Schnabel</u>, 697 F.3d at 118-19. Here, the parties dispute whether the Court should apply New York or California law. Viagogo contends that California law controls because the Agreement includes a California choice-of-law provision. (<u>See</u> Mem. at 9.) On the other hand, Berlinger argues that the choice-of-law provision is "irrelevant" to the determination and that, after applying New York's choice of law rules, the Court should find that New York contract principles govern the matter at hand. (Opp'n at 5-6.)

Here, the Court agrees with Berlinger that the California choice-of-law provision does not control, as the Second Circuit has found that those clauses do "not determine the law that . . . should apply to determine whether the arbitration clause [is] part of any agreement between the parties unless and until it is determined that the parties have agreed to and are bound by it." <u>Schnabel</u>, 697 F.3d at 119. Otherwise, a court would incorrectly "presume the

applicability of a provision before its adoption by the parties has been established." Id.

Federal courts sitting in diversity apply state substantive law and adopt the choice of law analysis of the forum state. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 (1996); see also Beth Israel Med. Center. v. Horizon Blue Cross & Blue Shield, 448 F.3d 573, 582 (2d Cir. 2006). "Where the applicable law from each jurisdiction provides different substantive rules, a conflict of laws analysis is required." Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998). However, "the Court need not embark on a choice-of-law analysis in the absence of an actual conflict between the applicable rules of two relevant jurisdictions." DeBlasio v. Merrill Lynch & Co., No. 07-CV-318, 2009 WL 2242605, at *19 n.14 (S.D.N.Y. July 27, 2009) (internal quotation marks and citation omitted).

Here, in line with the Second Circuit, "the choice between California law and New York law [is not] dispositive with respect to the issue of whether an arbitration agreement was formed," as both states apply "substantially similar rules for determining whether the parties have mutually assented to a contract term." Meyer, 868 F.3d at 74. When an online contract is involved, the relevant inquiry is whether

the party had "actual" or "inquiry" notice of the terms of the contract. See, e.g., Pizarro v. QuinStreet, Inc., 2022 WL 3357838, at *2 (N.D. Cal. 2022) (finding that where "there is no evidence that [a] website user had actual knowledge of [an online] agreement, . . . the occurrence of meaningful assent ordinarily turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract") (internal quotation marks and citation omitted); Schnabel, 697 F.3d at 120 (finding that "where there is no actual notice of the term, an offeree is still bound by the provision if he or she is on *inquiry* notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent").

Similarly, under both New York and California law, the question of inquiry notice depends on the "design and content" of the website or relevant user interface. See, e.g., Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1177 (9th Cir. 2014) (finding that inquiry notice turns on "the design and content of the website and the agreement's webpage," including the "conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design"); Starke v. SquareTrade, Inc., 913 F.3d 279, 289 (2d Cir. 2019) (citing Nguyen to find

11

that "[i]n the context of web-based contracts, [the court] look[s] to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put her on inquiry notice of such terms").

Accordingly, this Court need not "resolve this typically thorny choice-of-law question," because both New York and California "apply substantially similar rules for determining whether the parties have mutually assented to a contract term." Meyer, 868 F.3d at 74 (internal quotation marks and citation omitted); see also Schnabel, 697 F.3d at 119 (explaining that neither the district court nor the Second Circuit need resolve the question of whether Connecticut or California law applied because the issue was "without significance"). Here, the Court finds that under either California or New York law, the parties formed a valid contract, as Berlinger had sufficient notice of the terms.

As noted, the contract-formation question turns "on whether a reasonably prudent offeree would be on notice of the term at issue," as "where there is no actual notice of the term, an offeree is still bound by the provision if he or she is on *inquiry* notice of the term and assents to it through the conduct that a reasonable person would understand to

constitute assent." <u>Schnabel</u>, 697 F.3d at 120. Courts analyze the "totality of circumstances" to determine whether the "terms and conditions [are] clear and conspicuous," <u>Soliman v. Subway Franchisee Advert. Fund Trust, Ltd.</u>, 999 F.3d 828, 830-31, 842 (2d Cir. 2021), and whether the "design and content" of the website facilitates or prevents inquiry notice. <u>Nguyen</u>, 763 F.3d at 1177.

Berlinger relies on two primary arguments in support of its contention that no inquiry notice existed in this case: (1) "Viagogo hindered [Berlinger] from reviewing the Terms by giving them only ten minutes to complete their purchase - distracting them, coercing them, and depriving them of inquiry notice and preventing mutual assent"; and (2) the checkout screen was "cluttered with distractions and [did] not present the Terms in a clear and conspicuous way." (Opp'n at 9, 16.)

First, Berlinger asserts that the ten-minute countdown timers – visible on each page of purchase flow and on the website tab – inhibited inquiry notice because they were "visually distracting and disruptive to the purchase process," "drew the eye away from any hyperlink" to the Agreement, and "imposed an unfair barrier to formation by preventing [Berlinger] from seeking out and reading the Terms

13

during the purchase process." (Id. 13-14.) Viagogo counters by pointing the Court to a recent decision in this District - Kern, 2024 WL 5283923 - in which an arbitration agreement was upheld despite the presence of a countdown timer. In Kern, the plaintiffs alleged that StubHub violated New York state law by initially displaying a fee-less ticket price - only disclosing additional fees after plaintiffs had progressed through multiple pages of the purchase flow. See id. at *1. A clock indicating the time remaining to complete the purchase was also featured prominently above one of the "Buy Now" buttons and corresponding link to the "terms and conditions." Id. at Dkt. No. 31; (Mem. at 14-15). Despite not addressing the presence of the timers explicitly, the court found that "textual notice" of the terms and conditions, which, as is the case regarding Viagogo's purchase screen, was "displayed immediately above the 'Buy Now' button," provided the plaintiffs with "reasonably conspicuous notice of the arbitration agreement." Kern, 2024 WL 5283923, at *3. The court noted that the text "appear[ed] in dark gray font" and stood "out against the white background" and that the phrase "terms and conditions" was "offset in bright blue font, which prominently identifie[d] and distinguishe[d] it from the rest of the notice and indicate[d] an associated hyperlink." Id.

14

"When clicked," the Kern court continued, "the hyperlink open[ed] the User Agreement, which contain[ed], in bolded and capitalized text, a prominent notice of the arbitration agreement." Id.

Here, the design and content of Viagogo's purchase flow is nearly identical to the design and content of StubHub's ticket purchasing platform. Further, despite Berlinger's contention that the timers were "visually distracting and disruptive to the purchase process" and "drew the eye away from any hyperlink" (Opp'n at 13-14), the countdown clock was located on the upper right-hand corner of the checkout screen and on the webpage tab – visually separated from the "Buy Now" button and the "terms and conditions" hyperlink. (Id. at 19.) This positioning adds further support to Viagogo's reliance on Kern, where despite the timer's direct placement above one of the "terms and conditions" hyperlinks, the court still found that "by clicking the 'Buy Now' button, Plaintiffs unambiguously manifested their assent to the arbitration agreement and effectuated a valid arbitration agreement between themselves and StubHub." 2024 WL 5283923, at *3.

While Berlinger is correct that courts may consider "the level of difficulty in accessing the incorporated terms," Soliman, 999 F.3d at 839, and that a consumer should have a

15

"realistic opportunity to review and scroll through the electronic agreement," Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 398 (E.D.N.Y. 2015), the Court is unpersuaded that Viagogo's countdown clocks rendered access or review of the relevant terms too difficult. While the purchase flow depicted obvious timers, it also included an explicit and clickable link to the purchase terms – a design sufficient to put "a reasonably prudent user on inquiry notice" of the Agreement. Pizarro, 2022 WL 3357838, at *2.

Finally, Berlinger argues that "[e]ven if the time-pressured countdown clock did not exist," the checkout screen was "cluttered with distractions and [did] not present the Terms in a clear and conspicuous way." (Opp'n at 16.) Berlinger points the Court to Nicosia, 834 F.3d at 235-237, in which the Second Circuit found that Amazon's purchasing screen contained various cluttering and distracting elements – including the presence of customers' personal addresses and shipping options – that ultimately prevented inquiry notice of the additional terms. The Nicosia court specifically noted that "the presentation of terms [was] not directly adjacent to the 'Place your order' button so as to indicate that a user should construe clicking as acceptance." Id. Here, by contrast, the hyperlinked terms *were* adjacent to the "Buy

16

Now" button – appearing directly above the relevant language in conspicuous grey and blue text. (Opp'n at 19.) And even if "[p]roximity . . . does not necessarily make something more likely to be read," Viagogo's final checkout screen did not include many of the same elements of the "elaborate webpage design" that the Nicosia court found were cluttering. Id. The left side of the screen, where the "Buy Now" button was positioned, showed only the chosen payment method and the customer's email address, and the link to the Agreement featured prominently as part of the webpage's design. (Opp'n at 19.) The Court finds that the terms were not "conspicuous in light of the whole webpage" and provided adequate and sufficient notice to the purchaser. Nicosia, 834 F.3d at 236-37.

As Viagogo notes, sign-in wrap agreements – whereby a "website provides reasonably conspicuous notice of the terms to which the consumer will be bound" and the "consumer takes some action, such as clicking a button" – "may be an enforceable contract based on inquiry notice." Chabolla v. ClassPass Inc., 129 F.4th 1147, 1154 (9th Cir. 2025). And on this issue, the Court finds persuasive the ample case law Viagogo cites, in which other courts have found inquiry notice in similar circumstances to those present in the instant

17

dispute. <u>See</u>, <u>e.g.</u>, <u>Kern</u>, 2024 WL 5283923, *3 (finding that "Plaintiffs unambiguously manifested their assent to the arbitration agreement" because "StubHub's textual notice explicitly advised Plaintiffs that, by clicking the 'Buy Now' button, Plaintiffs accepted StubHub's terms and conditions"); <u>In re StubHub Refund Litigation</u>, 2021 WL 5447006, at *5-6 (N.D. Cal. Nov. 22, 2021) (finding that there was "no risk of confusion as to whether users, by purchasing tickets on StubHub, [were] agreeing to the User Agreement," as the "webpage clearly explain[ed] to guests that '[b]y purchasing or signing in, you agree to our user agreement and acknowledge our privacy notice'"); <u>In re StubHub Refund Litigation</u>, 2023 WL 5092759, at *1 (9th Cir. Aug. 9, 2023).

Simply stated, given the location of the hyperlink and the design of Viagogo's website, the Court is not convinced that reasonable minds could disagree as to whether Berlinger had inquiry notice of the Agreement before clicking the "Buy Now" button. Accordingly, the Court finds that under either California or New York law, the parties formed a valid contract.

B.    <u>SCOPE OF THE ARBITRATION AGREEMENT</u>

Because the Court finds that the contract between the parties is valid, it next considers "whether the particular

18

dispute in question falls within the scope of that arbitration agreement." <u>Kern</u>, 2024 WL 5283923, at *2 (internal quotation marks and citation omitted). "[A]rbitration must be preferred unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." <u>Thomas James Assocs., Inc. v. Jameson</u>, 102 F.3d 60, 65 (2d Cir. 1996) (internal quotation marks and citation omitted). As the Second Circuit has found, "a court should decide at the outset whether the arbitration agreement [is] broad or narrow." <u>Collins & Aikman Prods. Co. v. Building Systems, Inc.</u>, 58 F.3d 16, 20 (2d Cir. 1995) (internal quotation marks and citation omitted). "[A] court should compel arbitration, and permit the arbitrator to decide whether the dispute falls within the clause, if the clause is 'broad.'" <u>Prudential Lines, Inc. v. Exxon Corp.</u>, 704 F.2d 59, 64 (2d Cir. 1983). The "paradigm of a broad clause," is a clause "submitting to arbitration any claim or controversy arising out of or relating to the agreement." <u>Collins</u>, 58 F.3d at 20 (cleaned up).

Here, the parties' Agreement stipulates that "any and all disputes or claims that have arisen or may arise between [Berlinger] and [Viagogo] relating in any way to or arising out of this [Agreement][,] . . . or [Berlinger's] use of or

access to the Site or Services, or any tickets or related passes sold or purchased through the Site or Services shall be resolved exclusively through final and binding arbitration." (Agreement § 23.1.)

Berlinger argues that the claims "do not arise out of" the terms of the Agreement but instead arise from Viagogo's "misleading and insufficient disclosure of its fees during the purchase flow process." (Opp'n at 22-23.) Berlinger further contends that the Agreement does not reference Berlinger's transactions with Viagogo and that the "FAC does not allege that [Viagogo] breached or violated any provision or obligation" set forth in the Agreement. (Id. at 23-24.) Berlinger points the Court to Davitashvili v. Grubhub Inc., 131 F.4th 109 (2d Cir. 2025), a case in which the Second Circuit found that the arbitration provision did not apply to the plaintiffs' claims. However, that case is readily distinguishable from the instant matter. In Davitashvili, the plaintiffs claimed that Grubhub violated antitrust laws by inducing restaurants to agree to no-price competition clauses. Id. at 119. The court found that because the plaintiffs alleged that Grubhub's anticompetitive practices caused them to pay higher prices when ordering from other platforms, the claims concerned access and use of those "*other*

platforms and restaurants." Id. The court explained that the allegations contained in the complaint had "nothing to do" with the plaintiffs' "individualized use of Grubhub's website or mobile application." Id. Further, relevant to the case's posture as a class action, the circumstance that any members of the class used Grubhub's platform was "purely coincidental." Id. at 120.

Here, Berlinger's claims do not relate to access or use of platforms other than Viagogo. The allegations center squarely on individuals' experiences using the website and the asserted "bait-and-switch pricing tactic in [Viagogo's] purchase flow." (Opp'n at 23-24.) The Court finds unpersuasive Berlinger's contention that the claimed statutory violations are "based on conduct occurring before any agreement to purchase tickets was formed." (Id. at 23.) Courts in this District have found similar allegations to be well within the scope of a valid arbitration agreement. See, e.g., Kern, 2024 WL 5283923, at *1 (finding that plaintiffs' allegations that StubHub violated New York state law by quoting them "a fee-less" ticket price and not initially "disclosing additional fees" were within the scope of the parties' arbitration agreement). As noted, the Second Circuit has counseled that "a court should compel arbitration" if the

21

clause at issue is "broad," which courts have further defined as a clause "submitting to arbitration any claim or controversy arising out of or relating to the agreement." Prudential Lines, 704 F.2d at 64; Collins, 58 F.3d at 20 (cleaned up). Here, the Court finds that Berlinger's allegations fit within this "paradigm" and are "presumptively arbitrable." Collins, 58 F.3d at 20. Accordingly, the Court grants Viagogo's motion to compel arbitration.

Finally, because the Court grants the motion to compel arbitration, it also stays the action pending individual arbitration of the claims pursuant to Section 3 of the FAA. See 9 U.S.C.A. § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]").

## IV.  ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 17) filed by defendant viagogo Entertainment Inc. to compel arbitration and stay the claims (Dkt. No. 10) brought by plaintiffs Robert Berlinger, Danny Collins, and David Stockton, on behalf of themselves and others similarly situated, is **GRANTED**.

**SO ORDERED.**

Dated:     27 January 2026
           New York, New York

_____
Victor Marrero
U.S.D.J.